**UNITED STATES of America,
Plaintiff,**

v.

**Southerly Portion of BODIE ISLAND, NAGS HEAD TOWNSHIP, DARE COUNTY, STATE OF NORTH CAROLINA, and Frederick W. Lewis, Nikoli Miller et al., Defendants.**

Civ. A. No. 401.

United States District Court
E. D. North Carolina,
Elizabeth City Division.

Jan. 10, 1967.

Robert H. Cowen, U. S. Atty., Raleigh, N. C., by William S. McLean, Asst. U. S. Atty., for plaintiff.

Worth & Horner, Elizabeth City, N. C., Hubert Humphrey, of McLendon, Brim, Brooks, Pierce & Daniels, Greensboro, N. C., McCown & McCown, Manteo, N. C., for defendants.

## JUDGMENT AND OPINION

### Content Of The Report

LARKINS, District Judge.

Since entering the previous orders in this case, the Court has again reviewed the record and the report. When the Report is placed squarely beside the evidence in this case, it becomes apparent that the Report determined all of the significant factual issues which developed during the hearings and on which genuine conflicts in the evidence developed. These were:

(1) Whether there was a demand for west side property (soundside, as distinguished from oceanside) in the area involved: the Commission found that there was, and went into considerable detail as to the nature and extent of the development of this demand. (Findings of Fact 30, 15, and 16).

(2) Whether the tracts were unusually subject to overflow from the ocean or sound: the Commission found that they were not. (Finding of Fact 17).

(3) Whether the water on portions of the tracts involved resulted from sound or ocean overflow or whether the water was fresh water trapped by vegetation and could therefore be drained: the Commission found that it was fresh water, being rainwater trapped in the flat interior of the tracts. (Findings of Fact 18 and pp. 44, 57, and 65 of the Report).

(4) Whether or not the property is in an area notorious for mosquitos: the Commission found that it was. (Finding of Fact 19).

(5) The nature and depth of the water in the sound bordering the tracts: the Commission made findings as to the depth of the water, which on windless days is shallow for a considerable distance from the shore, and also described the nature of the water and the tides in the sound. (Findings of Fact 23, 24, and 26).

(6) The type of the bed of the sound and the shore line: the Commission found

it to be compact sand. (Finding of Fact 25).

(7) The ability of boats to come into shore: the Commission found that boats of shallow draft can approach close to the sound side of the property but cabin cruisers cannot unless a channel is dredged out to the deep water of the sound. (Finding of Fact 25).

(8) Whether the sound water next to the tracts is adaptable and attractive for bathing and playing: the Commission found that it was, especially for use by children. (Finding of Fact 26).

(9) What was the highest and most profitable use for which the tracts were adaptable or needed, or likely to be needed in the reasonably near future: the Commission found this to be residential development. (Finding of Fact 27). This resolves the principal issue and conflict of opinion among the appraisal witnesses in the case, the three witnesses for the plaintiff testifying that hunting or a game refuge was the highest and best use, and the nine real estate witnesses for the various defendants testifying that the best adaptable use was for residential building of some form. The Commission's finding goes on to recognize the need for draining and filling the lower portions of the property and to realistically explain the need for a holding period before subdividing the entire portion of the tracts.

(10) Whether a marine, canal-type, subdivision was both physically and economically feasible (many of the defendants' witnesses testifying it was, and the plaintiff's witnesses testifying it was not): the Commission found that it was not, because of the lack of sufficient evidence of a real demand in the market place at that time. (Finding of Fact 27).

(11) Whether the 1951 sale from Sawyer to Pipkin-Woodford of the land of which Tract #6 was a part, prior to the opening of the paved State Highway through the property, should be considered as a comparable sale (the defendants strenuously objecting on the ground that it was remote in time and also prior to the opening of the area by the construction of a paved State Highway and telephone and electricity facilities through the property): the Commission, overruling defendants' objection to its admissibility, found the sale was the most nearly comparable sale but recognized that prices in the area had sharply increased from the date of the sale to the date of taking. (Findings of Fact 28 and 29).

(12) Whether the sales of property in Craven and Carteret Counties far removed from the area involved relied on by witness Mills should be considered as comparable sales: the Commission found that they were not comparable in respect to location or use. (Finding of Fact 28).

(13) Which other sales were considered for purposes of comparison: the Commission listed the particular sales considered for purposes of comparison (some of the sales testified about not being included), recognizing and giving weight, however, to differences in location, time, and terrain. (Finding of Fact 28).

(14) Whether there was severance damage to the defendants' remaining land: the Commission found that there was, and explained the basis of it. (Finding of Fact 31 and Conclusion of Law 7).

(15) Whether there were benefits to the defendants' remaining property by reason of the project for which the property was condemned: the Commission found that there were none. (Finding of Fact 31 and Conclusion of Law 7).

(16) What was the elevation and terrain of the land taken: the Commission found in detail the elevations and terrain of the tracts and the sections within the tracts. (pp. 41–44, 56–57, 65 of the Report).

(17) What the kind of soil is on the tracts involved, the testimony sharply conflicting as to whether it was marsh and mud or sand: the Commission found that it was sand. (pp. 41–44, 56–57 of the Report).

(18) The related issue of whether those flat portions of the interior of the tracts which had water standing on them were "marshy" and "boggy" and "swamps" as testified by plaintiff's witnesses, or whether it was firm ground, consisting of hard sand, on which water had been artificially impounded by the use of dikes and canals to facilitate hunting for fowl and also trapped by the vegetation: the Commission found the latter to be the fact. (pp. 39–40, 44, 56–57, 65, 18 of the Report). This and the preceding two issues were directly related to the question of adaptability of the land for building and therefore went to the heart of the usefulness and value of the land.

■ All the fundamental facts having been found and the disputed factual issues which affected value having been resolved, the only remaining task was the determination of the fair market value of each of the tracts before and after the taking, the difference between these two figures being the award of just compensation. This the Commission did. It went further and found what portion of the difference was severance damage. This disclosed what portion of the award was the market value of the part taken, and what portion was damage to the remaining part. The Report shows that these valuations are well within the range of the expert and other testimony. The average valuation of plaintiff's witnesses was approximately $31 per acre for the land taken. The average valuation of defendants' witnesses was approximately $398 per acre for the land taken. The portion of the Commission's award attributable to the value of the land taken figures out to be $160 an acre for each of the 4 tracts. This valuation is clearly supported by the evidence. It is considerably nearer the plaintiff's appraisals than the defendants' appraisals, being $129 an acre higher than the average of plaintiff's and $238 lower than the average of defendants', and bears a similar relation to the highest appraisal of plaintiff and the lowest appraisal of defendants. Likewise the finding of the amount of the severance damage to the remaining lands of each of the defendants is supported by evidence and is within the range of the appraisals of expert witnesses.

There is no indication that any further breakdown was employed by the Commission. The contrary is indicated (the Report states on p. 41: "Values were not assigned by sections, but said divisions were made to indicate the types of land involved."). If a requirement of further breakdown or division were forced upon Commissioners, there would be no reason why these sub-figures could not be required to be further broken down and the Commission required to explain why it used those amounts instead of some other amounts, and so on, ad infinitum. The determination of market value is ultimately and essentially a matter of opinion and judgment. This is true of every actual real estate sales price, and it was true of the appraisers which the Government presented to the Commission, each of whom put a flat per acre value on the property and were unable or unwilling to break it down any further.

■ The Federal Courts have not required as a matter of law any further refinement than was afforded at bar. A case directly in point in Cunningham v. United States, 4 Cir., 270 F.2d 545, cert. den. 362 U.S. 989, 80 S.Ct. 1078, 4 L. Ed.2d 1022 (1960). The commissioners' report in that case, which this Court has read, was quite similar to the Report at bar, making a finding of the fair market value of each of the tracts taken, after making findings on various factual issues, just as the instant Report has done. The Court of Appeals ordered this report to be confirmed even after the District Judge had set it aside. The Supreme Court denied certiorari. 362 U.S. 989, 80 S.Ct. 1078. The decision in United States v. Merz, 376 U.S. 192, 84 S.Ct. 639, 11 L.Ed.2d 629 (1964) does not undertake to overrule the approach followed in *Cunningham* and other recent decisions of the Courts of Appeal or to hold fatally defective a report as

detailed and informative as the Report at bar, which not only marked the path followed by the Commissioners but resolved every factual issue raised in the case. Moreover, the *Merz* decision has to be read in light of the summary-type reports which were before the Court. To clarify the situation, the *Merz* opinion expressly says: "The commissioners need not make detailed findings such as judges do who try a case without a jury" (It would hardly be seriously argued that a judgment of a Federal judge in a case tried by the Court without a jury containing findings of fact and conclusions of law as exhaustive as in this Report should be reversed on the grounds that it was inadequate). The Opinion further states: "We do not say that every contested issue raised on the record before the commission must be resolved by a separate finding of fact. We do not say that there must be an array of findings of subsidiary facts to demonstrate that the ultimate finding of value is sound and legally based." While the Report at bar could, of course, have included some additional detail and further recitation of the evidence the fundamental and essential findings are present, and, on careful analysis, it appears to clearly satisfy the minimum standards indicated by the *Merz* case and other pertinent Federal decisions.

After reviewing the transcripts of the evidence, the Court has determined, and so finds, that the findings contained in the Commission's Report are accurate and are supported by the preponderance of the evidence and said findings and awards are therefore confirmed, and they are adopted as the Court's findings of fact and awards. In addition, certain supplemental findings and comments on the evidence are included in the determinations made below where the Court deemed it helpful and proper to do so.

The Court has given special attention to the points raised by the objections of the parties and the four questions mentioned in the Court's opinion and order of March 10, 1966, and has carefully reviewed the Report and the evidence in the record on these points; and the Court makes the following determinations and findings thereon. They apply equally to tracts 2, 3, 4 and 6 unless specifically made applicable to one particular tract. The parenthetical references are to pages of the several transcripts of the evidence:

### Conditions of Nearby Real Estate Developments Immediately Prior to the Date of Taking.

It is necessary to understand the location of the tracts involved and the situation in the Dare County beach area at the time of the taking. The tracts at bar are located in the South Nags Head section of the narrow north-south peninsula, sometimes generally referred to as the Nags Head area, which forms part of the famous Outer Banks of North Carolina. The southernmost end of this peninsula is at Oregon Inlet, across which is Hatteras Island. U. S. Highway 64, coming from the mainland of North Carolina (and ultimately from across the United States), after crossing historic Roanoke Island, reaches the Outer Banks where it junctures with U. S. Highway 158 which runs north along the peninsula. The location where U. S. Highway 64 reaches the beach and junctures with Highway 158 is known as Whalebone Junction. The northern boundary of subject properties is a little over a mile south of Whalebone Junction. The Cape Hatteras National Seashore Park for which the tracts were taken now has its northern boundary at Whalebone Junction.

Beginning at Oregon Inlet and coming northward the first tract is the Cunningham-Worth tract which was taken for the Cape Hatteras National Seashore Park in 1953. This tract was involved in a condemnation case which twice went to the United States Court of Appeals, being reported at United States v. Cunningham, 4 Cir., 246 F.2d 330 (1957) and 4 Cir., 270 F.2d 545, cert. den. 362 U.S. 989, 80 S.Ct. 1078, 4 L.Ed.2d 1022 (1960). Immediately north of the Cunningham-Worth tract is a tract referred to as the Dare County tract which formed part of the National Park in 1953; the

northern boundary of that tract was the northern boundary of the Park prior to 1958. On May 13, 1958, plaintiff condemned part of the lands owned by defendants in this proceeding for an addition to the Cape Hatteras National Seashore Park, taking the area lying west of a line 281 feet west of the state highway to Oregon Inlet, and running westward to Roanoke Sound. This taking, which originally involved 6 tracts, brought the Park up to Whalebone Junction. Tracts #1 and 5 have been disposed of and are not involved in this proceeding. Tract #6 (Pipkin-Woodford) adjoins the northern boundary of the Park as it existed prior to 1958. Then, proceeding northward, lie Tract #4 (Greenvale Hills Corporation), Tract #3 (Lewis), and Tract #2 (Miller), which is a little over a mile south of Whalebone Junction. Prior to taking these four tracts stretched from the Atlantic Ocean to Roanoke Sound, an east-west distance varying from 1 to 1½ miles. The north-south width of the tracts varied as follows: Tract #6, approximately 2500 feet; Tract #4 and #3 approximately 2000 feet each, and Tract #2 approximately 8000 feet.

These tracts are immediately south of the old established Nags Head-Kill Devil Hills-Kitty Hawk beach area. After World War II a great boom in activity and in property values in the area took place, continuing up to the time of taking (and beyond). After the construction of the bridge across Croatan Sound in the mid 1950's, connecting the mainland with Roanoke Island and the Nags Head area (there having been for many years a bridge and causeway between Roanoke Island and the Outer Banks), the evidence was that the hub of the beach activity moved to Whalebone Junction near the tracts at bar. (Transcript, Tract #2, pp. 417–418, 370–371, 162–163, 165–166, 264; Tract #4, p. 303). In 1952 a paved State Highway from Whalebone Junction to Oregon Inlet was opened, running through the land of the defendants, and telephone service and electricity accompanied the highway. This had the effect of opening up the several miles of property south of Whalebone Junction which were not included in the National Park. (Tract #2, pp. 369, 370, 271, Tract #6, p. 184). Houses and motels were built along the ocean front and also along the Oregon Inlet Highway, including on the west side of said highway. (See Tract #6, pp. 477–478).

This development was taking place only a few hundred feet from and in some cases next to the part of defendants' land eventually taken by plaintiff and extended down to the south line of Tract #6. Property values along the ocean front portion of the land of defendants had risen from $16 per front foot in 1951 to $70 per front foot in 1958 (Tract #6, pp. 534–536, 829). The real estate experience of the entire Dare County beach area showed that the ocean front developed first with a subsequent shift of interest to the west side property and that as values on the ocean front went up, west side values, although not as great as the ocean front, increased at a proportionate or greater rate (see Tract #2, pp. 416–417, 129–130, 162–163, 169, 264, 274–275). The area below Whalebone Junction followed the same trend. (Tract #2, pp. 417, 253–254, 266; Tract #6, pp. 183–184).

After the opening of the State Highway in 1952, several of the defendants began to develop the oceanside area, retaining, however, a substantial area of ocean frontage. Each of the defendants also began to formulate plans about the development of the west side running back to the sound. The owners of Tract #6, Pipkin and Woodford, investigated the feasibility of a residential development utilizing canals leading off from the sound to increase the amount of water frontage lots, conferred with a developer with experience in this kind of development, and made some effort to purchase a dredge for this purpose, prior to the taking of their property on May 13, 1958 (Tract #6, pp. 195–198, 6–9, 13–17). There was also evidence that the owner of Tract #2, Miller, had considered the development of the west side from the

highway to the sound by construction of alternating canals and streets patterned after such developments in Florida (Tract #2, pp. 93–94, 99, 104). The owners of Tracts #4 and #3 were in the process of developing a portion of the tract west of the highway, and actually had equipment working until they were stopped by the institution of this condemnation proceeding (Tract #4, testimony of Hewlett Lewis).

Immediately prior to the taking, then, the situation south of Whalebone Junction was that virtually all of the privately owned land west of the highway was included in the four tracts owned by the several defendants in this proceeding who had acquired them some years earlier for investment and were formulating plans for development of the sound side area for residential purposes, while a considerable number of houses and commercial establishments had been built in the adjacent area along the ocean and on both the west and east sides of the Oregon Inlet highway. Thus for comparable acreage sales and the prospects for development of the tracts taken it is necessary to look at the portion of the nearby area of this same Outer Banks peninsula lying north of Whalebone Junction.

North of Whalebone Junction, property on the west (sound) side had been, prior to the date of taking, subdivided and sold off for residential and commercial purposes in the following areas: (1) R. D. Owens subdivision, sea to sound, about one mile north of junction, for residential and commercial purposes, (2) Roanoke Sound Shores, Inc., a development from the sound to within 300 feet of old Highway 158, (3) Nags Head soundside development, (4) Kitty Hawk Shores development by Mrs. Diane Baum, (5) Avalon Beach, from sea to sound for residential purposes and sound side sold out in two years, (6) Orville Beach, from ocean to sound, (7) Tate property, purchased by B. M. Hedrick, a witness, and developed from the sea to the sound, (8) Croatan Shores and Hedrick's Addition to Croatan Shores developed and sold by witness for government, Harry Lawrence,

sound side and interior property, (9) The development of Ernest Meekins which sold off lots from the bridge over Currituck Sound all the way to the beach, (10) Southern Shores, development from sea to sound and plotted and sold soundside water front lots on canals or "lagoons" in the years just prior to the taking (significantly, the ocean front property in the area of the tracts at bar was selling for more than the ocean front property in Southern Shores by the time of taking: Tract #4, pp. 526, 528) (Tract #2, pp. 399–400, 504–508, 515, 146, 268, 275; Tract #4, pp. 151, 153, 313, 524).

At the time of taking, property in these nearby real estate developments was being used for recreational purposes, summer cottages, permanent homes, commercial establishments furnishing products and services to the residents and visitors of Dare County. Thus west side developments were being carried on and prices were increasing. The portions of the west side which had not been actually subdivided, which was a large part of the area, were being held by the various owners or occasionally sold as acreage tracts, and had substantial value even though they had no improvements thereon, as shown in the next section of this Judgment and in section on "Comparable Sales".

*Use and Value of Sound Front Property for Residential and Recreational Purposes in the Nearby Areas Immediately Before the Taking.*

That the sound-front property did have a use and value for residential development and general recreational purposes at and before the date of taking is shown by the development and subdivision of soundside property in the nearby areas, which was detailed in the foregoing section. Also pertinent on this point are the sales of acreage tracts on the west (sound) side, without ocean frontage or even highway frontage for prices considerably higher than the awards made. See discussion of some of these sales in the section on Comparable Sales, infra.

(See also Tract #4, pp. 151–153, 197; Tract #2, p. 508).

The sound appealed to the public because of (1) the tremendous interest in boats and boating which had arisen, since boats can be docked and easily launched only in the sound area and not in the ocean; (2) the warmth and safety of the shallow sound waters for bathing, especially for children; (3) the visual attractiveness of waterfront property; and (4) the extremely high prices of ocean front property, forcing people of moderate means who wanted to have a place at the beach to turn to sound side and interior land. (Tract #2, pp. 129–130, 264, 349, 385, 389, 410, 508; Tract #4, pp. 197, 524, 373; Tract #6, pp. 208, 110–111, 114, 333). One of the Government's main witnesses, Hall, acknowledged this appeal to the public (Tract #2, pp. 775–776). The value and use of sound side is also shown in the evidence referred to in the section on "Demand for Land Involved", infra.

In this connection, the contention that the fact that the west side property along the peninsula, i. e., between the highway and the sound, did not have houses on it proved that the land did not have any substantial value, is contrary to the evidence. For example, see Tract #2, pp. 402–403, 162, 433.

The scarcity of houses and businesses on the sound side does indicate that it did not have nearly as high a value as the developed ocean front, but the witnesses and the Commission did not appraise the west side at anything like as high a value as the ocean side. As stated by real estate expert Hedrick, who valued the tracts taken at approximately $330 an acre: "I don't attempt to compare that tract and property with property that's built up. Now this is not built up property. This property is in the course of development and I valued it as property in the course of development." (Tract #2, p. 433). The Commission valued the area taken at only $160 an acre. A comparison of this with the admitted market value of the eastern, ocean, side of these very areas involved

at the time of the taking, of $70 a front foot or $7000 for a 100-foot lot and of the small lots in the interior without any water frontage but with some street frontage of $1,000 per 50-foot lot, shows that ample consideration was given to the considerable differences in value.

*Suitability of the Tracts for Residential Development, Including a Marine-Type Subdivision.*

There was a great deal of reliable evidence that the highest and most valuable use to which the tracts were reasonably adaptable at the date of taking was for residential development, including such related commercial uses as motels, boat marinas and the like. The evidence established, and the court finds, that the lands involved were suitable for residential development and that there was a demand for such use at the time of taking. Testimony of real estate experts *Williams* (Tract #2, pp. 263–364, 300; Tract #6, pp. 476, 483; Tract #4, p. 241), *Young* (Tract #2, pp. 207–209, 156; Tract #6, pp. 433–434, 463; Tract #4, p. 196), *Foreman* (Tract #2, pp. 385–386, 371–372; Tract #6, pp. 496–497), *Middleton* (Tract #2, pp. 334–336; Tract #6, pp. 368–369, 371–372, 396, 420–421), *Hedrick* (Tract #2, pp. 430, 415–416; Tract #6, pp. 532, 541–542; Tract #4, p. 286), *Whitehurst* (Tract #6, pp. 333, 340), *Cochran* (Tract #4, pp. 358, 359, 367, 373, 375–376, 417), of two of the property owners, *Pipkin* and *Lewis*, who had considerable experience in real estate (Tract #6, pp. 190–195, 242–243, 250–252, 300), and of an expert in land development and engineering, *Butler* (Tract #6, pp. 92, 100; Tract #2, pp. 23–27, 215–216, 218–224).

There was considerable evidence to the effect that this residential development could have reasonably taken the form of a "marine subdivision" utilizing canals and waterways through the property, providing the lots with a canal on one side and a street on the other, and that this property was especially suitable for this kind of a development for which there was a demand at the time of taking. (Tract #2, pp. 93–94, 104–105, 109, 156,

209, 333–335, 416, 430; Tract #6, pp. 6–9, 13–16, 26–28, 93, 100–104, 195–198, 240, 251–252, 292, 328–331, 339–340, 368–369, 371, 374–380, 412–413, 415, 420–421, 433; Tract #4, pp. 358, 359, 367, 373, 375, 376, 417). However, the Commissioners found that the property was not adaptable for a canal-type residential development and in view of the conflicting evidence on this point (see e. g., Tract #2, pp. 488–498; Tract #6, pp. 761, 812) and the thorough personal inspection of the lands by the Commissioners, one of whom was a real estate expert, the court will not set aside the Commission's finding on this issue but will adopt same.

■ Of course, a finding that the highest and most profitable use for which the property was reasonably adaptable was for residential development is quite different from valuing the land as if it were already sub-divided or on the basis of the expenses, income, and profit from a projected subdivision, which manifestly would not be proper. The Report of the Commission reveals that it followed the proper approach on this. The awards represent the best judgment of the Commission and now of the Court of the fair market value of the land as a whole in its then existing state as of the date of taking. The highest and best use of the property is simply one of the factors which would be considered by a buyer and seller in an actual transaction in the market place and would enter into the determination of the market price. With respect to land in its raw state not being put to any particular use but being held by the owner for anticipated rise in value, it becomes necessary to consider, just as a buyer would, what is the best use to which the property is reasonably adaptable.

This was the substance of the evidence from the numerous real estate experts who testified on this matter; it is clear from the record that their appraisals were based on the market value of the tracts as a whole in their then existing condition and that prospective uses were considered only to the extent that it would reasonably enter into the

thinking of a buyer and seller and for whatever bearing the prospect of demand for such use had upon the market value of the tracts at that time. See Government's cross examination of real estate witnesses in Tract #6, pp. 506–507, 463, 563–564; Tract #2, pp. 385–387; and see also Tract #2, p. 143; Tract #6, pp. 368–372, 476, 496–497, 500–501, 548; Tract #4, pp. 284, 285.

### Demand for Land Involved.

In connection with subject matter of foregoing section, one of the objections to the Report which plaintiff filed was that there "was no evidence to support a present or future demand for such [residential] use as of the date of taking." This objection is not well founded. The record contains ample evidence, from various real estate men in this Dare County area who were in the best position to know, and based on actual market activity, that such a demand for property of this kind and location did exist as of the date of taking. See Tract #4, p. 276; Tract #2, pp. 416–418, 466 (Hedrick); Tract #6, pp. 496–497, Tract #2, pp. 385–386 (Foreman); Tract #2, pp. 129–131 (Young); Tract #2, pp. 253–254, 263–264, 300–301, Tract #6, pp. 487–488 (Williams).

### Comparable Sales.

■ Because of the size and location of the tracts involved, there were no sales of land which could be considered to be identical. Since the sound side area in South Nags Head was either in the National Park or was held by the several defendants for investment purposes from the construction of the state highway to Oregon Inlet in 1952 until the tracts were taken from them in 1958, there were no strictly "similar sales" south of Whalebone Junction. Hence, it was necessary to examine sales of west side property north of Whalebone Junction, that is land lying between the highway and the sound. Most of the building in this area has taken place along the ocean front and the highway which runs close to the ocean. However, acreage tracts west of this area were, at and prior to the time of taking, being bought and

sold and afford the best available indication of the general real estate market in the Dare County beach area; none of these sales listed by the Commission in its Report are identical, but they can be used for comparison purposes with allowances made for differences, just as the Commission did.

One of the sales, from Potter to Roanoke Shores, Inc. (listed as Sale No. 2 on page 22 of the Report of Commissioners) has many similarities to subject tracts, and appears to be the most comparable sale available in the record: (1) it involved a large acreage tract, 260 acres, which compares closely to the 286 acres in Tract #6, the 307 acres in Tract #4 and the 310 acres in Tract #3, and is one of the few sizable acreage tracts available for comparison with Tract #2. (2) It was a west side tract having some frontage on Roanoke Sound but no ocean or highway frontage, like the tracts at bar. (Tract #2, pp. 146, 260, 373). (3) This Roanoke Shores property began 300 feet west of the highway and ran westward from there to the sound, quite similar to subject tracts which began 281 feet west of the highway and ran to the sound. (Tract #2, pp. 260, 146). (4) It was only a few miles from Whalebone Junction (see plaintiff's Exhibit 5, Tract #2, pp. 261, 575, 590–591, 607–609) and closer to Whalebone Junction and to the tracts at bar than any other sale presented (except for the 1951 Sawyer-Pipkin sale) (Tract #6, p. 513); thus it was approximately the same distance north of Whalebone Junction as subject tracts were south of Whalebone Junction. (5) At the time of the sale no highway ran through the property just as no highway ran through the portion taken by plaintiff. (Tract #2, p. 260). (6) It was not in the middle of a heavily developed area. (Tract #2, pp. 398, 397; Tract #6, pp. 513–514, 480). (7) The sale was proximate in time, occurring in 1956, even though values did continue to rise somewhat from 1956 to the date of taking in 1958 though not as sharply as from 1951 to 1955. (Tract #2, pp. 269, 270–271, 466, 120–121). (8)

Numerous real estate men who were quite familiar with both properties testified to the similarity between this property and subject tracts as to terrain, location, etc. (Tract #2, pp. 146, 260–262, 267–268, 291, 373, 398; Tract #6, pp. 513–514; Tract #4, pp. 260–261). The sales price of this 260 acre tract was $200,000, or $769 an acre. Portions of this Roanoke Shores property were several feet higher in elevation than portions of subject tracts, but it was a fairly flat level area (See plaintiff's Exhibit 5 and Tract #2, pp. 611–612), as was most of subject tracts, and Government appraiser Hall stated that the Roanoke Shores property "wasn't all high, dry ground", that it had a "streak of swamp that runs back through much of them between what is now the by-pass road and the sound and requires some drainage" (Tract #2, p. 738), that while most of the sales were of small acreage tracts "this Potter tract happens to be, I imagine, one of the larger ones, its 268 [sic] acres" (Tract #2, p. 737), and that it "had to have some work done on the drainage and so forth to make it suitable to develop. Of course it had to have a street built into it" (Tract #2, p. 741). At the time of this sale, this land had no street or highway frontage and none of the drainage or other work had been done. Subsequent to this sale of the entire tract, it was subdivided as Roanoke Sound Shores and lots were sold (Tract #2, p. 739). While witness Hall testified that the land was more suitable for development than the tracts taken (Tract #2, p. 741), the difference in the price determined by the Commission for the land taken, averaging $160 an acre, and the sales price of the Potter tract, $769 an acre, adequately reflects the variation in location and elevation, and appears to make the awards of the Commission conservative by comparison.

Several of the other sales provide a significant comparison. The Hedrick to Hilderbrand sale, in 1956 (listed as Sale No. 1 in the Report) had neither water or highway frontage, testified by Hedrick as being "very, very raw land" and

partly under water; the 17 acres sold for $680 an acre (Tract #2, pp. 420–421; Tract #4, p. 344). The Etheridge to Adams and the Etheridge to Pipkin sales (listed as Sale Nos. 3 and 6 in the Report) occurred in 1955 and involved land lying 600 feet west of the highway and extending westward but did not have any sound frontage; nevertheless, this land brought $300 an acre. (Tract #2, pp. 294, 146–147). The Hedrick to Marshall and Hedrick to Smith acreage sales in 1954 (listed as Sales Nos. 13 and 14 in the Report) had no sound or ocean frontage, with simply an access street to the properties (Tract #2, p. 429); yet the sales price was $400 an acre. Real estate witness, Foreman, who operated in the Kill Devil Hills-Nags Head area said that he knew of no land in the area which was selling for less than $300 an acre around the time of the taking. (Tract #2, p. 385).

■ The Report listed the sales to which consideration was given by the Commission for their comparability to the tracts taken and a sound explanation of the use of these sales was made showing a very realistic approach, (pages 21–27). So long as the sales are in the same general vicinity and are not too remote in time, character, and use, the similarities and dissimilarities can be readily recognized and evaluated by an intelligent and expert commission, and by such a comparison help to locate the subject property on the spectrum of known real estate values in the area. This was the approach the Report indicates was followed by this Commission, and I do not believe that under the circumstances it could have been more specific or mathematical in the comparison without becoming artificial and unrealistic.

Moreover the court believes that in an actual market transaction a prospective buyer and seller would in all probability ascertain and at least consider the sales listed in the Report for comparison purposes, which is obviously all that the Commission did. Application of some mathematical formula to translate these comparisons into dollars and cents or percentages is not essential, either. Comparisons of this kind are by their nature matters of opinion and judgment and not susceptible of slide-rule application. Moreover, to arrive at a computation of the market value of the tracts involved in this way would exclude other important influences which should be considered in arriving at just compensation, such as the appraisals of the many real estate experts who testified at the trial.

■ The Commission expressly ruled on the only sales which were the subject of controversy and objection. Over the objection of defendants, it found that the Sawyer to Pipkin sale in 1951 was admissible as a similar sale, although the weight to be given it would have to take into consideration that it occurred before the State Highway was opened and before the great increase in Dare County coastal real estate values occurred. It determined that the sales testified by witness Mills in Craven and Carteret counties many miles away and remote from the ocean should not be considered as similar or comparable sales. The Court so finds and affirms both of these determinations. To insist on some further refinement in the findings about the other sales would interfere with, rather than promote, the determination of just compensation.

*Elevation and Composition of the Land.*

The Commission's findings on these issues (pp. 41–44, 56–57, 65, and 19 of the Report) which directly relate to the basic question of suitability for residential development (p. 21 of the Report) are supported by the evidence. Surveyors testified that the elevation of Tract #2 above the water level in the sound ran from approximately one foot in the lowest areas to 6.5 and 7.5 feet, and higher, in the ridge areas. (Tract #2, pp. 58–62, 65, 82, 22); and that the flat area in the middle of the property averaged about 2 feet in elevation (Tract #2, pp. 548–556, 559, see p. 27). The elevations taken on Tract #6 ran 2.0, 2.4, 2.4, 2.6, 2.3, 2.2, 2.4, 2.3, 1.8 feet and 2.3, 2.2, 2.1, 2.6, 2.2, 1.8, 1.6, 1.5 feet along two east-to-west lines of elevation in the

northern and southern parts of the property, beginning at the new Park Service Highway and going westward to Roanoke Sound. (Tract #6, pp. 42–44). The area east of the new Park Service Highway and between it and the old Oregon Inlet Highway, part of which was taken by the Government, was about 4 feet in elevation (Tract #6, p. 76). Tracts 3 and 4 were generally similar in elevation.

A highway engineer who helped build a highway for the National Park Service through the mid-section of the tracts taken (after the taking) testified that the natural elevation along this location averages approximately 2 feet, rising higher than that where knolls and hummocks were located (Tract #2, pp. 549–550, 553–555, 643–644 and 653–656). Comparing this to the elevations of developed areas in Dare County, the ground on which sits the Dare County Courthouse in Manteo on Roanoke Island (across the sound from the tracts at bar) is 1.8 feet, Kitty Hawk Village is 1.5 feet, the land on the west side of Highway 158 by-pass opposite the large Sea Oatel Motel is 1.5 feet to 2 feet, the Mother Vineyard residential section on Roanoke Island is 1.5 to 2 feet (Tract #2, pp. 62–63, 57–58).

The overwhelming weight of the evidence was that the land was firm and not marshy or swampy and was basically composed of hard sand (Tract #2, pp. 23–25, 34, 51–52, 56; Tract #6, pp. 45, 47–48, 56, 81–83, 405, 436–439). The only soil test presented at the hearings verified this (Tract #6, pp. 84–87).

Certain portions of the land in the flat areas have a thin top layer of silt consisting of decayed vegetation (Tract #2, pp. 25, 52–53, 523). Two different expert land surveyors testified that this surface silt in these places was only 3 to 4 inches deep and that underneath was hard sand (Tract #2, p. 25; Tract #6, pp. 45, 48, 82). A highway engineer for the National Park Service likewise testified that once this surface material (which according to his testimony averaged at least 6 inches in depth) was removed, the ground underneath was hard

and firm, and a good highway was built thereon (Tract #2, pp. 521–524, 641–642, 659), and that soil taken from a wide area on subject tracts was used as fill for the highway (Tract #2, pp. 645–646, 659). Other expert witnesses directly testified that the elevation, soil, and terrain of the land made it suitable for residential building purposes (Tract #2, pp. 23, 56–57; Tract #6, pp. 92–93, 100, 368, 437, 438).

It is also noted that a careful first hand examination of all parts of the tracts was made by the Commissioners, one of whom was a real estate expert.

The Commission's findings (pp. 39–40, 44, 56–57, 65, 18 of the Report) was about the artificial impounding of water on a portion of the tracts and the kind of condition existing in these "pond" or "sand flats" areas, is likewise supported by the evidence that the water had been trapped for wild fowl hunting purposes by construction of dikes and canals several decades ago (Tract #2, pp. 792–793, 795–797; Tract #6, pp. 287–288, 435–437); that prior thereto cattle had grazed on the land (Tract #2, p. 797; Tract #6, p. 54); that the bottom of the pond area is hard and sandy (Tract #2, pp. 24–25, 35, 52, 110), is several feet higher than the sound (Tract #2, pp. 58–59, 27) and can be drained, (Tract #2, p. 27); that the water therein is fresh water, being trapped rainwater, and not salt water (Tract #2, pp. 87, 110; Tract #6, p. 49).

*Susceptibility to Overflow.*

The Commission's finding on this issue (Finding of Fact 17) is supported by the preponderance of the evidence. (Tract #2, pp. 54–55, 68, 84; Tract #6, pp. 210, 211, 263–264, 522, 537–540). Government witness Hall agreed that every time the hurricanes affected the tracts involved, "it also happened to everything else up and down the coast", "that hurricanes weren't peculiar to the Miller property. They hit everything from Ocean City down." (Tract #2, p. 758). He also pointed out that the sound front is less subject to

damage than the ocean front (Tract #2, pp. 758–759). He further stated: "I don't want to give the impression at all that hurricanes only affected this particular property. It did not. They were all over the eastern seaboard, some of them" (Tract #6, p. 811). "Yes, sir, I want to say that I think the water that's on there now reflects the rains and I don't want to say that I have considered this to be a property that has a great percentage of it either under water or subject to water by unseasonable rains, and not by unusual circumstances." (Tract #6, pp. 842–843).

### Severance Damages.

The existence of severance damages was another issue to which considerable attention was devoted in the testimony. Prior to the taking, each of the owners owned a tract stretching from the Atlantic Ocean to Roanoke Sound. The Park Service condemned only a part of each of these tracts of land, taking that portion which lay west of a line established for the taking located 281 feet west of the state highway to Oregon Inlet. The Commission found that the taking and severance of the sound side property from the ocean front property caused some severance damage to the remaining property of each of the tracts. The Court adopts and affirms this finding which is supported by substantial evidence.

This severance damage consisted of the following factors, primarily: Before the taking, the tracts were susceptible of a unified balanced development as a whole, providing the ocean front lots with access to the sound (for boating, fishing, and bathing and wading). Some of the uses to which witnesses said the property was adaptable prior to the taking included, for example, a boat marina on the sound side for the use of all the property owners. By permanently depriving the ocean front area of a means of access to the sound, this remaining property was deprived of one of the rights and available uses which it had previously enjoyed when part of the undivided tract stretching from the sea to the sound, which was of value. (Tract #6, pp. 180–190, 301–304, 429–430, 528–530, 559–560, 572, 577, 575, 580). Moreover, the substantial reduction of the size of the land available to the owner for development had a damaging effect and restricted the available uses to which the property could reasonably be put and the range of feasible approaches to its development (Tract #6, pp. 529–530, 559–560, 572, 575, 577). Immediately prior to the taking, Tract #2 contained 1179 acres; after the taking the property owner was left with only about 69 acres. Immediately prior to the taking, Tract #3 contained 310 acres; after the taking the property owner was left with only about 40 acres. Immediately prior to the taking, Tract #4 contained 307 acres; after the taking the property owner was left with only about 40 acres. Immediately prior to the taking, Tract #6 contained 335 acres; after the taking the property owner was left with only about 49 acres. The testimony of real estate experts Robert Young and B. M. Hedrick, the evidence of Benton Pipkin, and other testimony, established a firm basis for the amounts found to be severance damage by the Commission.

The evidence showed that the tracts owned by the respective property owners at the time of the taking were held and used as a single tract, having been acquired as a single tract, and that although Miller had subdivided and sold off some ocean front lots, each of the owners still retained property which ran from the sound to the sea. The condemning authority arbitrarily drew a line of its own choosing across the middle of each of these tracts and condemned all the land to the west of this line of taking. Indeed, this is a classic example of a partial taking. The separation which the evidence dealt with was caused by the Government and not by the property owners. Real estate expert Hedrick testified, "You see, the thing is a tract that extends from the ocean to the sound is more valuable than an ocean front tract is itself valuable or a sound tract. * * * Now the tract as a whole, extending from the

ocean to the sound, has more value than the sum of separate values. It's a whole lot." (Tract #6, p. 572). "There are a lot of uses that you can use a tract of land with a sound front in connection with an ocean. Those uses are destroyed when you sever it." (p. 575, and see p. 577). "He can still market his ocean front but the market value of his tract is lessened by the fact that it does not go from the ocean to the sound. The market value of a tract as a whole is lessened by that fact." (p. 578).

The written objections to the Report filed by the Government within the time required and the supporting brief filed thereon did not contain any objection to the findings relating to severance damages. Thus the Government's argument since then on the severance damage question is not "timely objections" as explicitly required by United States v. Merz, 376 U.S. 192, 84 S.Ct. 639, 11 L.Ed.2d 629 (1964) and Federal Rule 53. In any event, however, the Government's contention cannot be sustained. The Commission's findings of severance damages should not be thrown out, because there is substantial evidence to support these findings, as pointed out above, and they cannot be properly determined to be clearly erroneous. Moreover, the Commission's weighing of the evidence on this point, involving a question of reduction of market values of the remaining portions, is entitled to considerable weight because of the expert composition of the Commission and their extensive personal observation of the property. The Commission's awards of severance damages of $22,890.00 in connection with the taking of Tract #2, $6,081.00 in connection with the taking of Tract #4, and $7,455.00 in connection with the taking of Tract #6, are supported by substantial evidence and are within the range of credible testimony, and the court finds that severance damage in these amounts has been incurred by the defendants.

### Conduct of the Hearing.

Another objection filed by plaintiff relates to the Commission's failure to rule on each objection of the evidence. This is not grounds for setting the Report aside. The Report indicates how all the significant questions of evidence were resolved, and the absence of specific rulings on each one of the hundreds of objections made during the course of the many weeks of hearings is not fatal to the validity of the proceeding or the Report. Even if technical rules of evidence were applicable, which is not the case, the record reveals that many of the objections appear to have been waived or abandoned by counsel, in failing to object to other similar testimony or in presenting evidence of a similar nature. In addition, the point raised by most of the objections entered into the weight to be given to the evidence rather than its admissibility, and it cannot be said either then or now that the information was the type that could not properly even reach the ears of the Commissioners.

The Courts have traditionally given Commissioners of appraisal in condemnation cases broad latitude in what they may hear on the question of factors influencing market value of real estate. This is inherent in the realistic marketplace test to be applied, and the very nature of the inquiry involved. To unduly restrict it or to attempt to rule on each objection and apply the technical rules of evidence which are applied in jury trials (although with increasing flexibility in Federal Courts) would be destructive of the main value of determination by a Commission under Rule 71A and contrary to its purpose.

It is to be noted that the Chairman of the Commission, the late Buxton Midyette, who supervised the deliberations of the Commission and personally drafted the underlying findings of fact and conclusions of law, was one of North Carolina's ablest legal minds, and a second member of the Commission, the late James Liverman, was also an experienced lawyer, so that, unlike many Commissions which are composed of laymen, a majority of this Commission were persons trained in the law.

204

The Fourth Circuit has already passed on this kind of objection, in United States v. Cunningham, 4 Cir., 246 F.2d 330 (1957) and Cunningham v. United States, 4 Cir., 270 F.2d 545, cert. den. 362 U.S. 989, 80 S.Ct. 1078, 4 L.Ed.2d 1022 (1960) (which happened to involve land just south of the subject tracts). The Commission in that case followed exactly the same approach as was followed in these hearings. The Court of Appeals twice refused to hold this error. At p. 333 of 246 F.2d the court expressly rules: "It was not necessary that the Commission rule on the admissibility of testimony and exclude that which was incompetent", so long as there were adequate findings in the report. The contents of the report there, which was found to be adequate and was ordered to be confirmed in the second appeal, followed lines virtually identical to the Report at bar.

### Awards.

The Court has now disposed of all the Objections to the Report filed by both plaintiff and defendants and has determined all questions raised by the parties or appearing on the record.

The Commissioners determined that severance damages in the amounts discussed above were incurred and the Report shows that the findings of the fair market value of the land actually taken by the plaintiff amounted to $160 per acre. As shown in the finding on comparable sales, this was substantially below sales of other sound side property in the area. Moreover, the sound frontage, which was generally considered to be the most valuable portion of the tracts taken, could have probably sold for about as much as the entire award. For example, there is approximately 2,500 feet of sound frontage in Tract # 6 (Tract #6, p. 528). At only $20 a front foot (compared to $70 a front foot which the ocean front of this tract was selling for at the time), this would have amounted to more than the entire portion of the award for the land actually taken. The same is true of the other 3 tracts involved. The range of the appraisals of the land actually taken, not including any severance damage, averaged as follows on a per acre basis: *Tract #2*: $18, $25, and $27 an acre for the plaintiff's witnesses, and $339, $346, $375, $410, and $500 an acre for the defendants' witnesses; *Tract #3 and #4*: $20, $42, and $50 an acre for the plaintiff's witnesses, and $330, $385, $400, and $502 for the defendants' witnesses; *Tract #6*: $20, $35, and $38 an acre for the plaintiff's witnesses and $330, $362, $375, $423 and $500 for the defendants' witnesses. The Commission's award is well within this range and is closer to the average valuation of the Government witnesses than it is to the average valuation of the property owners' witnesses, in the case of all four of the tracts involved.

The Court finds and determines that the valuations and determinations of damages made by the Commission and the awards contained in its Report are supported by the preponderance of the evidence, represent the fair market values of the Tracts at the date of taking, and constitute just compensation.

Therefore, it is ordered, adjudged, and decreed that defendants have and recover of plaintiff the following sums, less the amount of deposit made at the time of the filing of the Declaration of Taking, with interest at 6% per annum on the difference from said time until paid:

Wachovia Bank and Trust Company, Ancillary Administrator of the Estate of Nikoli Miller, Owner of Tract #2: $200,490.00

Estate of F. W. Lewis, owner of Tract #3: $ 55,681.00

Greenvale Hills Corporation, owners of Tract #4: $ 55,201.00

W. Benton Pipkin and wife Ruth P. Pipkin, and C. T. Woodford and wife, Evelyn L. Woodford, owners of Tract #6: $ 53,288.60

Let the Clerk enter Judgment forthwith.